UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES SECURITIES
AND EXCHANGE COMMISION,

    Plaintiff,

                  v.

KWAME M. KILPATRICK, and
JEFFREY W. BEASLEY,

    Defendants.

_____/

CASE NUMBER: 12-12109
HONORABLE VICTORIA A. ROBERTS

**ORDER GRANTING IN PART U.S. SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR FINAL JUDGMENT BY DEFAULT AGAINST DEFENDANTS KWAME KILPATRICK AND JEFFREY BEASLEY**

**I.   INTRODUCTION AND BACKGROUND**

This fraudulent "pay to play" scheme corrupted the City of Detroit's pension funds' investment process and arises from the actions of the former Mayor of Detroit, Kwame Kilpatrick, and the City Treasurer, Jeffrey Beasley.

Kilpatrick and Beasley sat on the governing boards of (1) the Police and Fire Retirement System of the City of Detroit ("PFRS") and (2) the General Retirement System of the City of Detroit ("GRS") ("Pension Funds").

Mayfield Gentry Realty Advisors ("MGRA"), headed by Chauncey Mayfield, became an investment advisor to PFRS in May 2005 and an investment advisor to GRS in June 2006.

On May 9, 2012, the United States Securities and Exchange Commission ("SEC") filed a five count Complaint against Kilpatrick, Beasley, Mayfield, and MGRA, alleging

1

securities fraud. The SEC alleges that Kilpatrick and Beasley received monies, gifts, and trips unlawfully from Mayfield, through MGRA. Only Counts III and V of the Complaint are applicable to Kilpatrick and Beasley; the other counts apply to Mayfield and MGRA who consented to final judgments against them.

### A. Count III – Fraud

Count III alleges that Kilpatrick and Beasley violated Section 10(b) of the Exchange Act, 15 U.S.C. §78(b), as well as Rules 10b-5(a), (b), and (c) thereunder. 17 C.F.R. 240.10b-5(a), (b), and (c).

### B. Count V – Aiding and Abetting

Count V of the Complaint alleges Defendants aided and abetted violations of Sections 206(1) and 206(2) of the Investment Advisers Act. 15 U.S.C. §§ 80b-6(1)-(2). The SEC alleges Defendants knowingly or recklessly provided substantial assistance to Mayfield and MGRA by (a) employing devices, schemes, or artifices to defraud the Pension Funds; and (b) engaging in transactions, practices, and courses of business that operated as fraud or deceit upon the Pension Funds.

### C. Proceedings

All Defendants were properly served. On May 16, 2012, the SEC served a Complaint and Summons on Kilpatrick at his home in Grand Prairie, Texas. On July 10, 2012, the SEC served a Complaint and Summons on Beasley at his home in Chicago, Illinois by leaving copies with his son, Chase Beasley.

Kilpatrick and Beasley failed to answer, plead, appear, or otherwise defend the Complaint. The Clerk of Court entered defaults against them on July 12, 2012 and August 31, 2012, respectively. Fed. R. Civ. P. 55(a).

On May 23, 2014, the SEC filed a motion requesting that the Court enter (a) default judgments; (b) disgorgement; (c) civil penalties; and, (d) permanent injunctions against Kilpatrick and Beasley. Neither Kilpatrick nor Beasley responded; the time to respond has lapsed.

## II.  COMPLAINT ALLEGATIONS

The SEC alleges that throughout 2007, Beasley solicited an extensive array of gifts for Kilpatrick and himself from Mayfield and MGRA. Mayfield delivered each time. One of the gifts included a lavish three-day vacation via private jet to Las Vegas for Defendants and their entourage. This trip cost MGRA more than $60,000 and included three rounds of golf, VIP hotel rooms at the Venetian Resort Hotel Casino, tickets to performances by singers Toni Braxton and Prince, and massages at the Canyon Ranch Spa.

The SEC also alleges Beasley solicited, and MGRA paid for, private jets to Bermuda and Tallahassee for Kilpatrick, Kilpatrick's wife, Kilpatrick's father, Beasley's son, and others.

At the same time Beasley solicited these gifts, Mayfield and MGRA recommended that the Pension Funds' Boards purchase over $115 million in securities offered by an entity controlled by Mayfield.

Kilpatrick, Beasley, Mayfield, and MGRA were fiduciaries to the Pension Funds. As such, each had a duty to disclose the gifts and the conflicts of interest created by the gifts. Despite their duty, none of the Defendants disclosed the gifts or the resulting conflicts of interest to the Pension Funds.

On several occasions in 2007, the trustees voted to continue and expand their

business relationship with Mayfield and MGRA. The trustees acted without the knowledge that Mayfield and MGRA had provided lavish gifts to Defendants. Defendants voted in favor of the investments, and Mayfield and MGRA received millions of dollars in fees from the investments. These allegations support both Counts against Kilpatrick and Beasley.

## III. DISCUSSION

### A. Default Judgment

The SEC requests default judgment against Defendants on Counts III and V, which allege violations of Section 10(b) and Rule 10b-5 of the Exchange Act, and aiding and abetting Mayfield and MGRA's violations of the Investment Advisers Act. The SEC argues it is entitled to default judgment because Defendants failed to respond to the Complaint.

#### 1. Standard of Review

Under Fed. R. Civ. P. 55(b), when a party against whom a judgment for affirmative relief is sought fails to answer, plead, or otherwise defend the complaint filed against it, the Court may enter a default judgment.

The Court is obliged to accept as true all facts alleged by plaintiff in its complaint and all reasonable inferences therein. *CTFC v. Marquis Fin. Mgmt. Sys., Inc.,* 2005 U.S. Dist. Lexis 41440, *5 (E.D. Mich. June 8, 2005) (citing *Thomas v. Wooster*, 114 U.S. 104 (1885)).

#### 2. Analysis

Default judgment is proper; Defendants failed to respond to the Complaint as well as this Motion. The Complaint was filed on May 9, 2012. On July 10, 2012, the Court

4

entered an Order extending the time to file an Answer; no answer was filed. Almost two years later, on May 23, 2014, this Motion for default was filed. Once again, Defendants failed to respond. Despite the defaults, the Court must still review the Complaint to decide whether it sufficiently supports the alleged claims.

Section 10(b) of the Exchange Act and Rule 10b-5 prohibit any person in connection with the purchase or sale of any security from directly or indirectly: (1) employing any device, scheme or artifice to defraud; (2) making any untrue statement of material fact or omitting to state a material fact necessary in order to make the statements made, in the light of circumstances under which they were made, not misleading; or, (3) engaging in any act, practice, or course of business that operates as fraud or deceit upon any person. 15 U.S.C. § 78j(b).

Individuals aid and abet violations of the Advisers Act when: (1) there has been a commission of an underlying securities violation; (2) the alleged aider-abettor had general knowledge that his role was part of overall improper activity; and, (3) the aider-abettor knowingly and substantially assisted the violation. *SEC v. Washington County Utility Dist.*, 676 F.2d 218, 224 (6th Cir. 1982) (citing *SEC v. Coffey*, 493 F.2d 1304, 1316 (6th Cir. 1974)).

The allegations in the SEC's Complaint, as outlined above and taken as true for purposes of default judgment, show that Defendants violated the Exchange Act and aided and abetted Mayfield and MGRA's violations of the Investment Advisers Act.

### 3. Conclusion

The Motion for Default Judgment is **GRANTED.**

### B. Disgorgement and Prejudgment Interest

To remedy Defendants' violation of the securities laws, the SEC requests that the Court order them to disgorge, on a joint and several basis, their ill-gotten gains, and to pay prejudgment interest on those amounts.

**1. Standard of Review**

    **i. Disgorgement**

Disgorgement forces a defendant to give up the amount, fraudulently obtained, by which he was unjustly enriched. *In re Smith,* 365 B.R. 770, 790 (Bankr. S.D. Ohio 2007) (citing *SEC v. Svoboda,* 409 F. Supp. 2d 331, 339-49 (S.D.N.Y. 2006)).

"The Court has broad equity powers to order the disgorgement of ill-gotten gains obtained through violations of the securities laws." *Id.* at 790 (citing *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998)). The Court also has broad discretion in calculating the disgorgement amount. *Id.* at 790 (citing *SEC v. Lorin,* 76 F.3d 458, 462 (2d Cir. 1996)). "Calculation of the defendant's economic gain need not be exact, and determination of the appropriate amount is left to the sound discretion of the trial court." *SEC v. Conaway*, 697 F. Supp. 2d 733, 747 (E.D. Mich. 2010).

The SEC has the initial burden to show that its disgorgement figure is a "reasonable approximation of the profits causally connected to the violation." *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989). The burden then shifts to the defendant(s) to show that this approximation is inaccurate. *Id.* But, in this instance, disgorgement will be made if the SEC meets its burden because Defendants failed to respond.

    **ii. Prejudgment Interest**

Prejudgment interest is an additional penalty added to disgorgement fees "to avoid a defendant from benefiting from the use of ill- gotten gains interest free"; it is a deterrent

6

to future SEC violations. *Id.*

The Court has discretion to add prejudgment interest to the disgorgement amount and to determine the rate used to calculate the interest. *Id.*

### 2. Analysis

#### i. Disgorgement

Defendants were unjustly enriched. Michigan's Public Employee Retirement System Investment Act, Public Act 314 of 1965 (PERSIA), prohibits trustees from receiving any consideration for their own personal gain from any party involved in transactions involving the assets of pension funds. The GRS's ethics policy also prohibits trustees from engaging in conflicts of interest or receiving bribes, gifts, or favors for their personal gain.

The SEC outlines four major trips between January – October of 2007 and the Pension Funds' voting decisions that followed each trip, all of which presented a serious conflict of interest making disgorgement necessary.

**The Charlotte, North Carolina Trip:** In January 2007, MGRA acquired a new building for PFRS in Charlotte, North Carolina. Beasley called Mayfield and told him that Beasley and Kilpatrick wanted to travel to Charlotte to inspect the building. At Beasley's request, MGRA made the hotel reservations and paid in excess of $3,000 for the hotel rooms.

No other PFRS trustees knew of or went on the trip to Charlotte to "inspect the building." Kilpatrick, Beasley, and their companions travelled to Charlotte and stayed overnight on January 22, 2007. They never inspected the building.

**The Las Vegas Trip:** In April 2007, Mayfield chartered a flight to Las Vegas for himself and several friends and invited Beasley.  Beasley suggested that Mayfield also invite Kilpatrick as an opportunity to clear up some friction between the two stemming from Kilpatrick's run for office in 2005.

MGRA paid for the entire $60,259.30 trip which included:

- Chartered flights on a private jet ($43,632.18);
- Seven VIP hotel rooms at the Venetian Resort Hotel Casino ($4,375.90);
- Toni Braxton tickets ($974.30);
- Prince tickets ($2,712.00);
- Dinner at McCormick & Schmick ($800.48);
- Golfing fees ($2,712.00);
- Private limousine charges ($5,289.00); and,
- Massages at Canyon Ranch Spa for Kilpatrick and Mayfield ($300.00).

MGRA accounted for these expenditures as business expenses.

In May 2007, MGRA sought to finalize the PFRS investment in the MGRA Genesis Value Fund, LP (the "Genesis Fund"), a limited partnership formed for the purpose of holding various real estate properties.  MGRA originally requested a $20 million investment in April 2006; it was given conditional preliminary approval from the PFRS Board in June 2006.

Weeks after the trip to Las Vegas, MGRA proposed a new deal; PFRS would transfer $55 million worth of the PFRS's properties to the Genesis Fund, in addition to a $25 million cash investment.  This new deal meant more money in management fees for Mayfield and MGRA.

8

On May 10, 2007, the PFRS Board approved the new proposal. Both Kilpatrick's designee to the PFRS Board and Beasley voted in favor of the proposal. Neither Kilpatrick nor Beasley informed the PFRS Board, or anyone associated with the PFRS, about the trip to Las Vegas.

**The Tallahassee Trip:** On July 20, 2007, Kilpatrick and his entourage flew to Tallahassee. Beasley asked Mayfield to charter a private jet at MGRA's expense. Beasley told Mayfield that Kilpatrick was going to raise money for the Kilpatrick Civic Fund.

The private jet cost MGRA $24,725. MGRA treated the expenditure as a business travel expense, not a charitable donation. MGRA did not seek a deduction on its taxes for the supposed $25,000 charitable donation. The Kilpatrick Civic Fund records do not reflect receipts for any donations on or around the dates of this trip.

In August 2007, the GRS Board voted to enter into a formal Real Estate Investment Advisory and Asset Management Agreement with MGRA ("Agreement"). Both Kilpatrick's designee to the GRS Board and Beasley voted in favor of the Agreement. Neither Kilpatrick nor Beasley informed the GRS Board, or anyone associated with GRS, about the trip to Tallahassee.

**The Bermuda Trip:** In September 2007, Beasley asked Mayfield to charter a private jet at MGRA's expense to take Kilpatrick and his wife to Bermuda. Kilpatrick and his entourage left for Bermuda October 4, 2007. During the trip, Kilpatrick and his father played golf with Steve Harvey and went to the Bermuda Music Festival. Beasley told Mayfield that Kilpatrick was going on this trip to raise money for the Kilpatrick Civic Fund.

The private jet cost MGRA $34,604.90. Mayfield claimed the jet was a "charitable donation." However, in its books and records, MGRA treated the expenditure as a business travel expense, not a charitable donation. The Kilpatrick Civic Fund's records do not reflect receipts for any donations on or around the dates of this trip.

Just weeks after the Bermuda trip, the GRS Board and the PFRS Board voted to invest and contribute millions of dollars in common shares and properties with MGRA Genesis Value REIT, Inc., (the "MGRA Genesis REIT").

On November 14, 2007 the GRS Board unanimously voted to invest $10 million in common shares with MGRA Genesis REIT. Both Kilpatrick's designee to the GRS Board and Beasley voted in favor of the investment.

On November 15, 2007 the PFRS Board voted to contribute approximately $67 million of PFRS properties and approximately $15 million in proceeds from the sale of another property to the MGRA Genesis REIT in return for securities issued by the REIT. PFRS also made a capital commitment of $25 million in cash to the MGRA Genesis REIT. Both Kilpatrick's designee to the PFRS Board and Beasley voted in favor of the investment.

Neither Kilpatrick nor Beasley told anyone associated with the Pension Funds about the trip to Bermuda. The Pension Funds voted to invest over $115 million with Mayfield and MGRA without the knowledge that over the preceding ten months, Mayfield and MGRA supplied Defendants with approximately $125,000 in extravagant gifts.

As trustees of PFRS and GRS, Defendants' duties and responsibilities were to disclose any conflict or potential conflicts of interest; they did not. Disgorgement is

10

appropriate. The unjust funds received to pay for these trips must be repaid because Defendants did not disclose that Mayfield and MGRA paid for these vacations before the City trustees voted to expand its business with Mayfield and MGRA. The question thus becomes, did the SEC reasonably establish the disgorgement amount?

The SEC has met its burden to show that its calculation of the disgorgement amount is "reasonable" and "causally connected to the violation." The SEC provided a declaration of Ann M. Tushaus, an accountant for the SEC. Tushaus states that she reviewed: (1) the Complaint; (2) the invoices from Pentastar Aviation for the chartered flights to Las Vegas, Tallahassee, and Bermuda; (3) the bank statements showing wire transfers from MGRA's bank accounts to Pentastar Aviation; and, (4) emails, credit card statements, and expense reports showing payment by MGRA for entertainment and travel expenses. This declaration sufficiently establishes definite figures from which computations for monetary relief can be made.

Based on the SEC's review and analysis of the records, Defendants received $122,923.87 in ill-gotten gains from MGRA. The Court finds this calculation accurate.

### ii. Prejudgment Interest

Defendants' illegal economic gain has been established; the Court, in its discretion, grants prejudgment interest. *See First City Fin. Corp.*, 890 at 1231.

The SEC proposed a method for calculating prejudgment interest. Tushaus applied the interest rate used by the IRS, adjusted quarterly, and the interest totaled $39,939. The SEC's calculation is sufficient.

### 3. Conclusion

Disgorgement is a proper remedy. The SEC may obtain the disgorgement from

11

either Defendant. *SEC v. Berger,* 11-10403, 2011 U.S. Dist. LEXIS 16860, 2011 WL 528843, at *3 (E.D. Mich. Feb. 8, 2011) (holding that joint and several liability is appropriate where multiple defendants have benefitted from the same ill-gotten gains).

The Court orders Defendants to disgorge their ill-gotten gains of $122,922.87 together with prejudgment interest of $39,939 for a total of $162,861.87.

### C. Civil Penalties

The SEC requests that the Court order Kilpatrick to pay a civil penalty of $390,000 for violating the anti-fraud provisions of federal securities laws. This is the maximum penalty of $130,000 for each major trip he took to Tallahassee, Las Vegas, and Bermuda.

The SEC requests that the Court order Beasley to pay a civil penalty of only $130,000, reflecting that his fraud was serious enough to warrant a maximum third tier penalty, but that he received a lesser benefit from the fraud than Kilpatrick.

#### 1. Standard of Review

The Court exercises its discretion, in light of the facts and circumstances of each case to determine civil penalties. 15 U.S.C. § 77t(d)(2).

Congress incorporated penalties into the securities laws when it enacted the Securities Law Enforcement Remedies Act of 1990 ("Remedies Act'). The Remedies Act is now codified at Section 21(d)(3)(A) of the Exchange Act. *Conaway*, 697 at 747; 15 U.S.C. § 78u(d)(3)(A). The Exchange Act has a three tier system for assessing civil penalties. *Id.* For a natural person, the maximum third tier penalty is (1) $130,000 per violation; or, (2) the gross amount of pecuniary gain to defendants as a result of their violations. *Id.*

"A third tier penalty applies where the violation(s) involved fraud, deceit, manipulation … and directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."  15 U.S.C. § 78u(d)(3)(A).

### 2. Analysis

Defendants' violations of the securities laws did involve fraud, deceit, and manipulation; civil penalties are appropriate.  From January 2007 through October 2007, Kilpatrick and Beasley solicited personal gifts of private jets and entertainment from Mayfield and MGRA.  Kilpatrick and Beasley had a duty to disclose these gifts to the PFRS and GRS Boards.  They did not.

Their violations of the securities laws, including material omissions, solicitation of personal gifts, and failure to disclose conflicts of interest, created a risk of potentially devastating loss to pensioners.  Defendants' violations corrupted the integrity of the Pension Funds' investment process.

In May 2007, weeks after the Las Vegas trip, the PFRS Board approved an expansion in business with Mayfield and MGRA, agreeing to invest $55 million instead of the previously proposed $20 million.  It did this without the knowledge that its advisers had just paid $60,000 for trips to Las Vegas for Kilpatrick and Beasley.

In August 2007, weeks after the trip to Tallahassee, the GRS Board voted to enter into the Agreement with MGRA.  The Board voted to formalize its business relationship with MGRA without the knowledge that Mayfield, through MGRA, had paid for Kilpatrick and his associates to travel in a $25,000 private jet.

In November 2007, weeks after the Bermuda trip, the PFRS Board and the GRS Board voted to invest over $115 million with MGRA.  The Boards voted in favor of this

investment without the knowledge that MGRA provided Kilpatrick and his entourage a $34,604.90 private jet for the trip.

The PFRS and the GRS Boards voted in favor of these investments without knowing that Mayfield, through MGRA, had supplied Kilpatrick and Beasley with over $122,000 in extravagant gifts over the past 10 months.

### 3. Conclusion

The Court reviewed the SEC's Complaint, Motion, and supporting documents. The SEC's request that Defendants pay civil penalties pursuant to Section 20(d) of the Securities Act, Section 21(d) of the Exchange Act, and Section 209(e) of the Advisers Act is **GRANTED.**

The Court **ORDERS** Kilpatrick to pay a civil penalty of $390,000.

The Court **ORDERS** Beasley to pay a civil penalty of $130,000.

### D. Permanent Injunction

The SEC requests that the Court permanently enjoin and Kilpatrick and Beasley from ever participating in any decisions involving investments in securities by public pension as trustees, officers, employees, or agents. This request is **DENIED.**

The Court must determine whether the SEC has shown a reasonable and substantial likelihood that Defendants, if not enjoined, would violate the securities laws in the future. *SEC v. Washington County Utility District*, 676 F.2d 218, 227 (6th Cir. 1982).

The SEC has the burden to show that a person has engaged in, is engaged in or is about to engage in, acts or practices constituting a violation of the federal securities laws. 15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d). The SEC must also show that a violation

has occurred and that there is a reasonable likelihood of future violations. *SEC v. Youmans*, 729 F.2d 413, 415 (6th Cir. 1984).

Courts must weigh the relevant factors to assess whether there is a likelihood of future violations: (1) the egregiousness of the violations; (2) the isolated or repeated nature of the violations; (3) the degree of scienter involved; (4) the sincerity of the defendant's assurances, if any, against future violations; (5) the defendant's recognition of the wrongful nature of his conduct; (6) the likelihood that the defendant's occupation will present opportunities (or lack thereof) for future violations; and, (7) the defendant's age and health. *Id.* at 415. No one factor is determinative; all relevant factors must be weighed. *Id.*

In one page of a twenty-one page motion, the SEC argues that it is entitled to a permanent injunction against Kilpatrick and Beasley to deter them from future violations of federal securities laws.

The SEC does not set forth facts that warrant a permanent injunction under Fed. R. Civ. P. 65; 15 U.S.C. § 77t(b); and 15 U.S.C. § 78u(d). This Court has cautioned that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived, and that it is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *United States v. Robinson*, 390 F.3d 853, 886 (6th Cir. 2004) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997). *See also United States v. Reed*, 167 F.3d 984, 993 (6th Cir. 1999).

In its discretion, and after review of the SEC's poorly briefed request for permanent injunctions, the Court **DENIES** the SEC's request to restrain and enjoin Defendants**.**

IV. **CONCLUSION**:

   A. The Court **GRANTS** the SEC's Motion **IN PART:**

      1. Disgorgement is **GRANTED** in the amount of $122,922.87, together with prejudgment interest of $39,939, for a total of $162,861.87.

      2. Civil Penalties are **GRANTED;** Kilpatrick must pay $390,000; Beasley must pay $130,000.

   B. The Court **DENIES** permanent injunctions against Defendants.

The SEC is directed to submit the appropriate Judgment based on this ruling.

   **IT IS ORDERED.**

                                        S/Victoria A. Roberts
                                        Victoria A. Roberts
Dated: July 31, 2014              United States District Judge